*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARSHAWN JAMES CURTIS,

        Defendant-Appellant.

UNPUBLISHED
March 19, 2026
2:04 PM

No. 369945
Ingham Circuit Court
LC No. 22-000140-FC

Before: KOROBKIN, P.J., and YATES and FEENEY, JJ.

PER CURIAM.

Defendant, Marshawn James Curtis, appeals by right following his conviction by a jury of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f) (force or coercion). On appeal, defendant argues that the trial court's admission of other-acts evidence, hearsay, and expert testimony was improper. Defendant also challenges the admission of a prosecution witness's testimony that he feared reprisal for testifying, argues that he was denied a fair trial and right to present a defense when a defense witness was not permitted to testify by videoconference, and contends that his sentence at the top of the guidelines range was disproportionate. We conclude that reversal is not warranted and affirm defendant's conviction and sentence for the reasons below.

## I. BACKGROUND AND FACTS

Trial testimony established that the incident at issue occurred in the early hours of March 26, 2012. The day before, defendant invited JP, who had just turned 17 and with whom he became acquainted at the Capital Area Transportation Authority (CATA) bus station,[1] to his

---

[1] JP and defendant's accounts concerning the timeline of their relationship differed. Defendant testified that he had just met JP on March 25, 2012, while JP testified that defendant was a friend with whom she spoke regularly at the CATA station almost every day. Testimony was introduced that defendant messaged JP from a Facebook account under the username "Mike Love" a few

-1-

birthday party at his home. JP and defendant exchanged numbers, and JP decided to go for a couple of hours because her other plans fell through. When she arrived at defendant's house off Reo Road in Lansing, defendant was hanging out with his brother, Tyreece Curtis, and his brother's then-girlfriend,[2] and she joined them in listening to music, drinking Crown Royal whisky, rapping, and smoking marijuana for several hours. JP missed the last bus home and defendant offered that she could stay the night. Eventually, defendant's brother and his girlfriend called it a night. Defendant and JP kept talking and listening to music until he took her to his bedroom.

JP testified that in defendant's bedroom, defendant started to grab JP's breast, crotch, and body outside her clothes, and she told him no and to stop. He continued, and she told him no and that she didn't want to have sex with him. Defendant tried to put his hands down her pants, but she pushed his hand away, again telling him no and to stop. The two struggled for a time while defendant tried to remove JP's pants and she tried to keep them up. Defendant eventually removed JP's pants, put his body weight on top of her, and "forced his penis into [JP's] vagina." She testified that she did not want penetration, felt scared, and tried to push on his hips to get him off of her. Defendant said, "I knew when I seen you your p**** was mine" and that he would get her pregnant "so no other n***** could get me." JP was terrified, crying, and didn't know what to do next. Her vagina hurt and her abdomen and chest were crushed. JP cried and pleaded with defendant, who was not wearing a condom, not to ejaculate but he said that he already did, and she tried to get him off but he said, "no, let me just sit inside you because I'm going to get you pregnant."

Defendant testified at trial and denied that his sexual activity with JP was unwanted. Defendant explained that after his brother and his girlfriend went to bed, JP agreed to go lie down and that they walked past his brother's bedroom to get to his bedroom, which did not have a door.[3] By defendant's account, he performed consensual oral sex on JP and engaged in consensual vaginal-penile intercourse, in which JP participated and did not tell him to stop. Defendant agreed that JP became upset when he ejaculated inside her. When he got out of bed and started to dry heave, JP looked at defendant's phone which had a message from another woman he was seeing, and he told her it was time to go. JP was upset and angry, and snatched her bag, put on her shoes, and headed toward the door.

JP testified that she saw an opportunity to get away when defendant got off her and began throwing up, and she grabbed her things and went for the front door. When she reached the porch, wearing only a T-shirt, defendant grabbed her by the arm and stood there, stroking his penis and masturbating, and told her to come back in and stay the night. JP pulled away, fell off the porch, and then got up and ran. Defendant testified that he followed her out of the house and that she

---

months before the assault and before they had become acquainted. In the messages, defendant stated, "You look older than 16. That's a good thing. Oh, I'm 18. You cute af though . . . . You should come hang out with me" but JP declined, replying, "I don't chill with strangers."

[2] The two later married but were divorced at the time of trial.

[3] Defendant's grandmother, Ethel Faye Curtis, who previously owned and occupied the home, echoed defendant's testimony regarding the home's layout.

stormed off angrily, but he denied masturbating. JP testified that she ran on the road to get away, eventually stopping to put on pants and shoes, and then kept running.

JP eventually stopped to call Nick Moccia, with whom she lived at the time, to come get her. She was hysterical and crying and didn't know where she was but ended up at a Meijer gas station with his direction. For his part, Moccia testified that he picked JP up across the street from a gas station near Reo Road and then after refreshing his recollection from a police report, agreed that it was at the Meijer C-Stop gas station. JP was quiet, nonresponsive, and withdrawn, which was atypical for her, and told him when they arrived at the house that something bad had happened.

In the morning following the incident, JP called her close family friend Tiffany Horner while hysterically crying and screaming and told Horner that she was raped. Horner told JP that she would come get her. While waiting at the CATA bus station, JP's friend James Kochel, Jr. observed that JP had tears in her eyes, appeared very stressed, and when he tried to hug her (as was customary), she told him not to touch her. JP said she had been at a party the night before; a man had been trying to touch her and pressure her to have sex; she repeatedly said "no"; and he "forced himself on her." JP asked him to wait with her at the bus station until Horner arrived to pick her up because she did not feel safe, and she pointed out the man on the bus. Kochel identified defendant, whom he regularly saw on the bus, in the courtroom. Horner picked up JP, who was crying and didn't want to talk, and took her to Sparrow Hospital.

Sexual Assault Nurse Examiner (SANE) Debra Yates examined JP at Sparrow on March 26, 2012 and was admitted as an expert in sexual assault examination and forensic evidence collection. When asked to describe what JP said had occurred, Yates read the history of the assault verbatim from the report she had authored:

> I went to hang out with Marshawn. He kept grabbing on me, feeling on me. I told him to stop. He kept trying to take my pants off. He was drunk. I said no. He said I knew when I seen you, your p**** would be mine. I'm going to get you pregnant. No other n***** is going to f*** with you because you're going to be mine. The only reason I got away was because he rolled over and puked. I got my clothes on, grabbed my things, put my shoes on, and ran out the door. As I was leaving, he was grabbing on me -- he was grabbing me. He said what the F is the matter with you. He said why are you leaving. And I said I told you to stop. I told you to get off me, and you disrespected me.

Yates's report also stated that there was penile penetration to the vulvar area, that no condom was used, and that JP's clothes were removed during the assault.

Yates described a diagram in her report, which showed several abrasions to the genital area including the labia minora and posterior fourchette and noted "three small areas of toluidine blue uptake" at the posterior fourchette; she explained that toluidine blue is a stain that adheres to damaged tissue and can highlight injuries. She also explained that injuries are not always present and estimated she did not find genital injury in at least about half her exams, but that injuries were found in JP's case. Yates authenticated photos depicting three bruises found on JP's body: a small bruise on the outer right thigh, a small bruise on the right inner thigh, and a small bruise on the upper left inner thigh. Yates opined that the patient's injuries were "consistent" with vaginal

penetration and that the patient's history was consistent with the injuries documented. Yates testified that JP indicated that she wanted her sexual assault kit turned over to the Lansing Police Department. On cross-examination, Yates indicated that the patient reported cunnilingus.

Former Lansing police officer Erk was dispatched to Sparrow on the evening of March 26, 2012 to take JP's statement for a criminal sexual assault report. Officer Erk also entered a phone number and first name provided to him by JP into LEIN, and the results yielded "Marshawn James Curtis" with an associated address at 921 Reo Road in Lansing. Officer Erk documented that defendant sent a text message to JP after the assault that said, "why you acting like I did something so horrible to you, it wasn't that deep."

The case was initially assigned to Catherine Farrell, a former detective with the Lansing Police Department. After reviewing her case notes, Farrell testified that she interviewed defendant but did not get a response from JP by phone or after sending her a letter, and the case was closed in 2012 after the prosecutor declined to issue a warrant. In March 2016, Lansing police sent JP's SANE kit to an outside lab as part of a statewide initiative, and then in July 2017 the Michigan State Police (MSP) lab performed further analysis to compare the SANE kit's DNA with defendant's DNA from a buccal swab. MSP's DNA analyst concluded that defendant was a possible contributor to DNA evidence collected from JP's cervical swabs, with virtually no statistical chance that he wasn't a match. In January 2022, the case was assigned to Detective Annie Harrison of the Ingham County Sheriff's Office as part of the Sexual Assault Kit Initiative Project, a multidisciplinary team that works cold-case sexual assaults based on previously untested SANE kits.

Holly Rosen, MSW, a social worker at MSU's domestic violence and stalking program, testified without objection as an expert witness in sexual assault dynamics. Rosen had worked with survivors for decades, estimating that she had worked with thousands of survivors, 90% of whom experienced sexual assault. Rosen discussed victim reactions that often fail to comport with common expectations as well as offender dynamics and responses to assault. Rosen did not speak to the victim in this case, review any evidence, or learn the specific details of the assault.

On cross-examination, defense counsel asked whether, when interviewing someone who says that they were assaulted, Rosen just takes a victim's word for it that an assault occurred. Rosen explained that she starts by believing the person so that you do not treat them as lying. When further questioned by defense counsel, Rosen denied identifying anyone who was not telling the truth in all the thousands of cases that she has worked during her career since 1981.

The prosecution also introduced testimony from several other-acts witnesses. EH testified that she met defendant on a dating website and that the events she described occurred in Gwinnett County, Georgia, on April 11, 2020. They met in person when defendant came to her place. When they got to her bedroom, EH told defendant to chill out, but he was forceful and put his body weight on her, and she closed her legs tight to keep him from assaulting her and tried to push him off. Defendant inserted his fingers into her vagina and then penetrated her with his penis. EH made it clear that she didn't want defendant there, but he didn't care. EH reported the incident to the police at the time and later learned from Detective Harrison that defendant's DNA was found in the SANE kit that was collected from her. When defendant testified, he denied that sexual intercourse occurred with EH, but stated that he rubbed EH's butt and vagina.

CM testified that in November 2018 she was approached by defendant at the Meridian Mall as she emerged from the women's restroom. Defendant came up behind her and asked if she remembered him; she said yes—she had previously encountered him when he was an inmate at the Ingham County Jail during her work as a recordkeeper. They had a brief conversation, and CM testified that defendant said, "I just watched you go to the bathroom" and that he liked the color of her blue underwear.

RL testified regarding an incident at the East Lansing Public Library on July 30, 2019. She noticed someone lurking behind her and watching her in the teen and children's section. She moved to the adult research section and the person followed her and started talking to her, telling her that she had the largest camel toe he had ever seen and that he had taken photos of her, and asked to see her feet so he could see her nail polish. The jury was shown a video of RL packing up and the person packing up and leaving first. RL explained that the person didn't want her to leave and said that they would leave instead. RL went to the front circulation desk to tell them what happened and they called the police. Kevin Hawley, a circulation supervisor at the East Lansing Public Library, reviewed surveillance footage after being alerted that a young woman needed help. Hawley testified that he observed on video a teenage-appearing young woman studying and a man sit down across from her, who put a hand down his shorts and extensively fondled himself. RL received a call in 2021 that the person was charged with some serious crimes and as a part of the plea they were not charging what the person had done to her.

JN recalled that she encountered defendant, whom she identified in the courtroom, on April 1, 2019, when she was returning from lunch on Washington Street in downtown Lansing while on jury duty. Defendant said something to the effect of "hey beautiful" to get her attention and then she saw defendant vigorously masturbating in his pants. She yelled, "are you kidding me?" at him, but he did not stop. JN testified she called 911 to provide information but could not stay on the phone because she had to report to the courtroom for jury selection. Dispatched to assist on JN's complaint, Officer Tyler Tenbrink observed someone matching the suspect's description jogging on Kalamazoo Street. Officer Tenbrink followed the suspect in his patrol vehicle and then on foot, yelling for him to stop; officers ultimately located him under a black Ford F-150 in a parking lot between Capitol and Washington before arresting him on an outstanding misdemeanor warrant. Jurors watched a short video of the chase.

In August 2019, college student HC testified that she was walking home alone from a bar around midnight in East Lansing when a person approached and started following her. She noticed that he pulled his pants down and was masturbating while talking to her. Afraid of being raped, HC stopped at a stop sign for a few minutes, and when a car with two men stopped, she banged on the front of the car and asked them to stay with her because the person was following her; they agreed. A police car that had been circling pulled over and she spoke with the police, who then escorted her to the police station to make a statement. HC testified that defendant pled guilty in her case.

Assistant managers at Schuler Books, Christopher Baratono and Alan Esser, testified that they reviewed surveillance footage in July 2019 when a person who was the source of complaints the day before returned to the store. Baratono described what he saw on the video footage from July 28 and 29, 2019 as an individual filming women and masturbating. Esser prepared clips of

the footage for use in court and described seeing an individual who seemed to be touching himself and followed someone into the women's bathroom.

Defendant admitted that he was the person in the videos shown at trial of him masturbating in public and that he exposed himself to HC in East Lansing but denied that he exposed himself to JN in downtown Lansing. He explained that he is a victim of child molestation and started publicly exposing himself and approaching women, but not touching anyone, in 2017 or 2018. Defendant explained that he had gone to therapy and sex offender programming (SOP) to get help and better control his urges after being on probation for a case involving public masturbation in East Lansing. Defendant denied that he has ever sexually assaulted any women. On cross-examination, defendant admitted that he continued drinking while taking the SOP class despite knowing that drinking contributes to his public exposure problem, and on redirect, defendant testified that he did not complete the class, but attended for about four or five months in 2011-2022.

Between testimony by other-acts witnesses, JP's former roommate, Moccia, was recalled for cross-examination by defense counsel because he had called Detective Harrison after testifying and disclosed that he picked up JP from 921 Reo Road (i.e., defendant's address). Moccia did not recall his original testimony that he picked up JP from the Meijer C-Stop. Moccia felt it was important to correct the information about where he picked up JP because he was asked if he could identify the location and wasn't initially able to. Moccia Googled defendant and found the address on Reo Road, recognizing the house when he saw it. After Moccia acknowledged to the prosecutor on redirect that his call to Detective Harrison was recorded, he was asked why he was concerned about his mom's safety and answered "[b]ecause we're in a trial on violence against women." Moccia clarified that in the recording he said, "my mom, my sister, my nieces, my whole family." When questioned about his concerns about returning to testify, Moccia stated he had spelled his name out twice in front of defendant and expressed concern that defendant could Google him.

The jury convicted defendant as charged of CSC-I. Defendant now appeals.

## II. ANALYSIS

## A. EVIDENTIARY ERRORS

Defendant asserts that he is entitled to a new trial because of multiple errors in the admission of evidence, and in some instances because his counsel was ineffective for failing to object. We disagree.

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *People v McMillan*, 213 Mich App 134, 137; 539 NW2d 553 (1995). The trial court's decision to admit evidence therefore "will not be disturbed unless that decision falls outside the range of principled outcomes." *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019) (quotation marks and citation omitted). However, "[p]reliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). Error in the admission of evidence is not a ground for reversal unless refusal to take this action appears "inconsistent with substantial justice." MCR 2.613(A); MCL 769.26; see also *People v Watkins*, 491 Mich 450, 491; 818 NW2d 296 (2012).

"[R]eversal is required only if the error is prejudicial. The defendant claiming error must show that it is more probable than not that the alleged error affected the outcome of the trial in light of the weight of the properly admitted evidence." *People v McLaughlin*, 258 Mich App 635, 650; 672 NW2d 860 (2003) (citations omitted).

Claims of evidentiary error not raised in the trial court are reviewed for plain error affecting substantial rights. See *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). To avoid forfeiture under the plain error rule, a defendant must show (1) that an error occurred; (2) that the error was plain; and (3) that the error affected his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish that a defendant's substantial rights were affected, a defendant must generally demonstrate that the error caused him "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764.

To establish a claim of ineffective assistance of counsel, "a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016), citing *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052, 80 L Ed 2d 674 (1984). "When the trial court has not conducted a hearing to determine whether a defendant's counsel was ineffective, our review is limited to mistakes apparent from the record." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Whether a defendant has been denied the effective assistance of counsel is a "mixed question of fact and constitutional law." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004) (quotation marks and citation omitted). Factual findings are reviewed for clear error and questions of constitutional law are reviewed de novo. *Id.*

## 1. OTHER-ACTS EVIDENCE

Defendant argues that the trial court committed reversible error by admitting other-acts evidence involving JP, JN, HC, CM, RL, and EH. We disagree.

In a pretrial ruling on the prosecution's request to introduce other-acts evidence, the trial court admitted the evidence concerning JP, JN, and EH under MCL 768.27b. As for the evidence concerning HC, CM, and RL, the trial court admitted it under MRE 404(b).

At the time of trial, MCL 768.27b(1) stated, in relevant part:

> [I]n a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403. [MCL 768.27b(1), as amended by 2018 PA 372.]

"MCL 768.27b is an exception to [the] general bar on propensity evidence; in prosecutions for offenses involving domestic violence or sexual assault, MCL 768.27b permits evidence of a

defendant's prior commission of domestic violence or sexual assault to show the defendant's character or propensity to commit such acts." *People v Berklund*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367568); slip op at 8. "The language of MCL 768.27b clearly indicates that trial courts have discretion 'to admit relevant evidence of other domestic [or sexual] assaults to prove any issue, even the character of the accused, if the evidence meets the standard of MRE 403.' " *People v Cameron*, 291 Mich App 599, 609; 806 NW2d 371 (2011) (citation omitted).[4] "Prior-bad-acts evidence of domestic violence [or sexual assault] can be admitted at trial because 'a full and complete picture of a defendant's history . . . tend[s] to shed light on the likelihood that a given crime was committed.' " *Id.* at 610 (citation omitted). MCL 768.27b therefore allows "prior-bad-acts evidence to be introduced at trial as long as the evidence satisfies the 'more probative than prejudicial' balancing test of MRE 403 . . . ." *Id.*

MRE 404(b) governs the admissibility of prior bad-acts evidence and provided at the time of trial:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case. [MRE 404(b)(1), as amended October 11, 2017, 501 Mich ccviii-ccix (2018).]

"Relevant other acts evidence does not violate Rule 404(b) unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith." *People v VanderVliet*, 444 Mich 52, 65; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). Put differently, "[e]vidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character." *People v Mardlin*, 487 Mich 609, 615; 790 NW2d 607 (2010). But evidence that is otherwise admissible must still be excluded if the probative value of the evidence is substantially outweighed by a danger of unfair prejudice to the defendant. MRE 403. "Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test . . . ." *Mardlin*, 487 Mich at 617.

Thus, evidence admitted under either MCL 768.27b or MRE 404(b) must satisfy MRE 403's balancing test. MRE 403 allows a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *People v Hoskins*, 342 Mich App 194, 202; 993 NW2d 48 (2022), quoting MRE 403. "Unfair prejudice" means that "there exists a danger that marginally probative

---

[4] At the time *Cameron* was decided, MCL 768.27b involved only domestic violence. In 2018, it was amended to include sexual assault. 2018 PA 372. The rationale of *Cameron* applies to sexual assaults for cases prosecuted after the statute was amended. See *Berklund*, ___ Mich App at ___; slip op at 8.

evidence will be given undue or pre-emptive weight by the jury" that is "out of proportion to its logically damaging effect" and "it would be inequitable to allow the proponent of the evidence to use it." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995) (citation omitted).

### a. JP, JN, and EH

Defendant first argues that the other-acts evidence pertaining to JP, JN, and EH was impermissible character or propensity evidence. He is not entitled to relief as to this argument.

The prosecution filed a notice of intent to introduce the challenged other-acts evidence. See MCL 768.27b(2). In 2012, JP disclosed to SANE nurse Yates that defendant performed oral sex on her, and defendant admitted to the same in a police interview. In 2019, JN observed defendant publicly masturbating in downtown Lansing and he was apprehended shortly after by police while hiding nearby under a truck. The prosecution also sought to present evidence that in 2020, defendant sexually assaulted EH in Georgia.

We reject defendant's character/propensity argument because the trial court admitted these statements under MCL 768.27b, which "is an exception to [the] general bar on propensity evidence," *Berklund*, ___ Mich App at ___; slip op at 8, and allows the prosecution to introduce relevant evidence of other acts of sexual assault[5] to "prove any issue, even the character of the accused," *Cameron*, 291 Mich App at 609. Accordingly, whether the evidence was meant to show the defendant's character or propensity to commit sexual assaults is irrelevant. See *id.*

Defendant next argues that the evidence was overly prejudicial under MRE 403. We disagree. There was no "danger that marginally probative evidence [would] be given undue or pre-emptive weight by the jury" because the evidence was highly probative. *Mills*, 450 Mich at 75. Evidence that defendant performed another unconsented sex act on JP and sexually assaulted other women was highly probative of whether he engaged in the forcible sexual assault with which he was charged. Thus, the trial court did not abuse its discretion by admitting the evidence. See *Bynum*, 496 Mich at 623.

### b. HC, CM, and RL

As for the other-acts evidence pertaining to HC, CM, and RL, defendant first argues that it was impermissible propensity evidence. We disagree.

This evidence was contained within the prosecution's notice of intent to introduce evidence and its substance was repeated at trial. In 2019, HC observed defendant exposing and stroking his penis in public in East Lansing. Defendant followed HC down the street, tried to talk to her, and would not leave her alone. In connection with this incident, defendant pleaded guilty to aggravated indecent exposure as a habitual offender, second offense. In 2019, defendant followed and approached CM at the Meridian Mall, telling her that he had watched her go the bathroom and liked her blue underwear. During that time frame, defendant was also captured on video

---

[5] "Sexual assault" is defined in MCL 768.27b(6)(c) to include any listed offense in the Sex Offenders Registration Act, MCL 28.722, so defendant's act against JN qualifies.

masturbating at a bookstore in the mall. In 2019, defendant followed RL in the East Lansing Public Library and told her that he "took a picture of her camel toe." Defendant was also recorded masturbating in the library.

The trial court reasoned that these other acts were admissible under MRE 404(b) to show scheme and credibility considering the nature of the conduct in the charged case—that is, acts of public masturbation. That's because defendant's acts of masturbation echoed the alleged conduct in the charged offense. Indeed, JP testified at the preliminary examination, and again at trial, that after sexually assaulting her, defendant followed her outside to the porch and grabbed her as she tried to escape. During the struggle, JP observed defendant with no pants on, stroking his penis. The other-acts evidence featured defendant following women, trying to talk to them, and masturbating in front of them. Rather than being offered to show conformity with character, the evidence showed a pattern of idiosyncratic conduct that was repeated during defendant's victimization of JP. See *People v Ho*, 231 Mich App 178, 186-187; 585 NW2d 357 (1998) (allowing evidence where "there is some special quality of the act that tends to prove the defendant's identity"). Notably, defendant denied masturbating in front of JP during the incident in question, so the other-acts evidence bolstered JP's overall credibility as to what occurred that evening.

Defendant next argues that even if the other-acts evidence pertaining to HC, CM, and RL were admissible for a noncharacter purpose, it was unfairly prejudicial under MRE 403. We disagree.

Although the evidence was voluminous, it was not "out of proportion to its logically damaging effect" such that allowing the prosecution to introduce it "would be inequitable" because it was highly probative. *Mills*, 450 Mich at 75. That is, the other-acts evidence, which occurred in the years following the charged offense, mirrored peculiar and sexually predatory behavior that defendant exhibited immediately after committing the charged offense, adding credibility to JP's testimony. The trial court therefore did not abuse its discretion in admitting the evidence. See *Bynum*, 496 Mich at 623.

## 2. EXPERT TESTIMONY BY DEBRA YATES

Defendant argues that the trial court plainly erred by allowing hearsay testimony from the SANE nurse that repeated statements made by the victim, or that counsel was ineffective for failing to object. The prosecution argues that an objection would have been futile because MRE 803(4) permits the evidence.[6] The prosecution has the better argument.

---

[6] The prosecution argues in the alternative that defendant has waived the issue by approving the admission of the medical report. See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). But agreeing to admit the medical report does not waive the issue. There is a difference between allowing a jury to review a medical report that contains the complainant's statements and having an expert in sexual assault examination and forensic evidence collection vocalize the complainant's statements. Recognizing the compelling influence of an expert in a child sexual

MRE 803(4) provides an exception to the rule against hearsay for statements made for purposes of medical treatment or medical diagnosis in connection with treatment.[7] As described by this Court, "[s]tatements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." *Shaw*, 315 Mich App at 674, citing *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011). "Particularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Mahone*, 294 Mich App at 215.

At trial, Yates testified as an expert in sexual assault examination and forensic evidence collection. Reading from her report on JP's examination, Yates testified that JP told her:

> I went to hang out with Marshawn. He kept grabbing on me, feeling on me. I told him to stop. He kept trying to take my pants off. He was drunk. I said no. He said I knew when I seen you, your p**** would be mine. I'm going to get you pregnant. No other n***** is going to f*** with you because you're going to be mine. The only reason I got away was because he rolled over and puked. I got my clothes on, grabbed my things, put my shoes on, and ran out the door. As I was leaving, he was grabbing on me -- he was grabbing me. He said what the F is the matter with you. He said why are you leaving. And I said I told you to stop. I told you to get off me, and you disrespected me.

Yates explained that she takes a statement from the patient to know what happened so that she knows where to look for injuries or problems. When asked how JP's statement affected the medical treatment that Yates would be providing, Yates answered that she knew she needed to perform a genital exam to look for injuries. Indeed, Yates discovered several abrasions to the genital area including the labia minora and posterior fourchette. Yates also identified three small bruises found on JP's thighs. JP also explained who the assailant was and that he was a friend.

---

abuse prosecution, our Supreme Court has observed that, "[t]o a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat." *People v Beckley*, 434 Mich 691, 722; 456 NW2d 391 (1990).

[7] At the time of trial, MRE 803(4) defined the exception as follows:

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment. [MRE 803(4), as amended May 21, 2001, 464 Mich clxxvii-clxxviii.]

According to Yates, SANE nurses ask about the relationship to the assailant because they want to ensure that the patient will be safe when they leave.

Defendant argues that this case is analogous to *People v Shaw*, 315 Mich App 668, in which this Court held that evidence recounting the complainant's statements that alleged sexual abuse by the defendant was not admissible under MRE 803(4), and that defense counsel's performance fell below an objective standard of reasonableness for failing to object. *Shaw*, 315 Mich App at 675-676. There, the prosecution's expert in child sexual abuse, Dr. Guertin, had performed a forensic physical examination seven years after the alleged abuse, which minimized the likelihood that it was performed for treatment purposes. *Id.* at 673-675. And police had referred the complainant to Dr. Guertin as part of the police investigation into the sexual assault. *Id.* at 675. Finally, the complainant saw a different physician for gynecological care during the intervening seven years. *Id.* On these bases, this Court ruled that the testimony was not admissible as statements made for the purpose of medical treatment under MRE 803(4). *Id.* at 675-676.

This case is distinguishable. JP sought care at Sparrow Hospital a mere two days after the assault—a far cry from the seven-year gap in *Shaw*. See *id.* at 674-675. And there is no indication in the record that JP went to the hospital at the direction of police or for some other purpose besides medical care in the aftermath of an assault. Instead, by providing her history to Yates, JP enabled Yates to look for injuries to her genital area. This case is more like *People v Garland*, 286 Mich App 1, 8-10; 777 NW2d 732 (2009), in which this Court held that statements made to a nurse at the hospital were admissible under MRE 803(4) when the complainant sought treatment on the same day of the alleged sexual assault and had contact with law enforcement only after the medical examination. Here, JP sought treatment two days after the assault and police investigated after the SANE exam was performed.

Merely because the SANE exam was later used by police does not undermine the trustworthiness of the statements made to receive medical care. See *People v Duenaz*, 306 Mich App 85, 96; 854 NW2d 531 (2014). "Particularly in cases of sexual assault . . . a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Mahone*, 294 Mich App at 215. Further, our Supreme Court in *People v Meeboer (After Remand)*, 439 Mich 310, 328-329; 484 NW2d 621 (1992), held that MRE 803(4) allows in information about the assailant's identity, which is relevant to treating the victim both physically and psychologically. In that vein, Yates explained that the assailant's identity was relevant to ensuring that the patient could return home safely.

Accordingly, because the evidence was properly admitted under MRE 803(4), no plain error occurred. Failing to make a futile objection is not ineffective assistance of counsel. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Thus, defense counsel was not ineffective for failing to make a futile objection. See *Mahone*, 294 Mich App at 215; *Ericksen*, 288 Mich App at 201.

### 3. EXPERT TESTIMONY BY HOLLY ROSEN

Defendant argues that Rosen's testimony impermissibly vouched for the complainant and that the admission of her testimony constituted plain error, or that counsel was ineffective for

failing to object to the presentation of Rosen as an expert witness. Defendant is not entitled to relief on either point.

"An expert may not vouch for the veracity of a victim." *People v Dobek*, 247 Mich App 58, 71; 732 NW2d 546 (2007). In the context of a criminal sexual conduct trial, an expert "cannot give an opinion on whether a complainant had been sexually assaulted if the 'conclusion [is] nothing more than the doctor's opinion that the victim had told the truth.' " *People v Thorpe*, 504 Mich 230, 262; 934 NW2d 693 (2019) (alteration in original), quoting *People v Smith*, 425 Mich 98, 109; 387 NW2d 814 (1986). Because defendant did not raise his improper vouching claim in the trial court, it is reviewed for plain error affecting substantial rights. See *Dobek*, 247 Mich App at 66-67.

Rosen, an MSW social worker at MSU's domestic violence and stalking program, testified as an expert witness in sexual assault dynamics. Rosen testified that she had worked with survivors for decades and estimated she had worked with thousands of survivors, 90% of whom experienced sexual assault. Rosen discussed victim reactions that often fail to comport with common expectations, such as delayed disclosure/reporting, inconsistent or nonsequential memories or memories lacking detail, varieties of reactions during an assault, and delayed medical treatment, as well as offender dynamics and responses to assault. Rosen did not speak to the victims in this case, did not review reports, transcripts, or other case evidence, and did not learn the specific details of the assault, but she did speak to the prosecutor to discern whether the scope of the case fell within her expertise.

On cross-examination, Rosen reaffirmed that she had not dealt with the victim in this case nor did she know the circumstances of the case. When asked by defense counsel whether when interviewing someone who says that they were assaulted, Rosen just takes a victim's word for it that an assault occurred, Rosen explained that, consistently with the "Start by Believing" national campaign for advocates and law enforcement, she starts by believing the person so that you don't treat them as lying, and then over time decisions can be made (presumably by law enforcement pursuing criminal charges) after gathering information from them. When further questioned by defense counsel, Rosen denied finding anyone who was not telling the truth in all the thousands of cases that she has worked during her career since 1981:

Q. . . . Without mentioning anything specific, have you found that someone was not telling the truth, in your experience?

A. Not in my experience.

Q. Okay. I think you said you have -- how many people have you assisted? Was it three to four thousand -- or, no. It was five to six thousand?

A. Yes. I have been doing this work since 1981. That's an estimate. Plus all the thousands on crisis calls, too. But the question was about sexual assaults and so that was three to four thousand.

Q. Okay. Out of those you haven't found anyone who wasn't telling the truth?

A. Not from my experience, no.

Defendant argues that Rosen's commentary, by stating that (1) she starts by believing the alleged victim and (2) she had never found anyone who was not telling the truth in the thousands of cases she has worked on, amounted to impermissible vouching for JP's credibility. Under the circumstances of this case, we disagree.

When a defendant elicits testimony, "he cannot now be heard to complain that its admission was in error." *People v King*, 158 Mich App 672, 677; 405 NW2d 116 (1987); see generally *People v Paquette*, 214 Mich App 336, 342; 543 NW2d (1995). Here, defense counsel specifically invited the testimony from Rosen by asking whether she had experienced false accusations in her practice. Cf. *Thorpe*, 504 Mich at 254 (concluding that defense counsel did not open the door to testimony elicited on redirect, observing that defense "[c]ounsel did not ask [the expert] about the frequency with which children lie, whether children make false allegations of sexual abuse, or whether he has had any experience with false accusations in his own practice"). Counsel not only elicited the testimony initially, but invited Rosen to double down by clarifying the number of cases Rosen had handled over her long career and then asking essentially the same question about whether she ever found that anyone was untruthful. Defense counsel even referenced the elicited testimony in closing, seemingly emphasizing that Rosen was a biased advocate:

> [Rosen] testified that she has spoken with 6,000 alleged victims of sexual assault and domestic violence. When I asked her if she felt like any of those 6,000 people were not telling the truth, she said, no, they all told the truth. They brought her here as an expert and that she might be, but she's more of an advocate than an expert. She speaks from an advocate's perspective.

A defendant cannot harbor error and then use it as an appellate parachute. *People v Bart*, 220 Mich App 1, 15; 558 NW2d 449 (1996) (denying relief where the assertedly prejudicial evidence was "introduced by defendant during cross-examination of the victim" and marshaled at closing argument "to support defendant's theory of the case"). Accordingly, because defendant elicited the testimony at issue not once, but twice, and then relied on it in closing argument to advance an argument that Rosen was biased, he cannot now argue on appeal that the admission of the testimony was in error. See *id*.

As for defendant's argument that counsel was ineffective for failing to object to the admission of the expert, defendant is not entitled to relief. Defense counsel stated "[n]o objection, your Honor" when asked by the Court whether they had an objection. Trial counsel telling the court that they have no objection to the admission of evidence constitutes a waiver, and waiver extinguishes any error. *People v Johnson*, 315 Mich App 163, 193; 889 NW2d 513 (2016). But defendant fails to develop the argument that counsel's waiver constituted ineffective assistance, constituting abandonment of the issue. See *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004). Regardless, this Court has repeatedly recognized the value of expert testimony on sexual assault dynamics such that admitting the expert's testimony was not error. See *People v Muniz*, 343 Mich App 437, 443; 997 NW2d 325 (2022) ("Michigan courts regularly admit expert testimony concerning typical and relevant symptoms of abuse . . . ."); *People v Spaulding*, 332 Mich App 638, 659; 957 NW2d 843 (2020) ("expert testimony is admissible and appropriate" to explain the "behavior of victims of varying kinds of trauma [that] often appears irrational and confusing to most people . . . .").

Nor is defendant entitled to relief on his argument that counsel was ineffective for eliciting the testimony from Rosen. Defendant must overcome a strong presumption of effective assistance of counsel. *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). And sound trial strategy that is unsuccessful does not amount to ineffective assistance of counsel. *Bart*, 220 Mich App at 15 n 4. Revealing an expert's potential bias is sound trial strategy. See *People v Hill*, 282 Mich App 538, 541; 766 NW2d 17, aff'd in part, vacated in part on other grounds 485 Mich 912; 773 NW2d 257 (2009) ("Exposing a witness's motivation, bias, and prejudices is a crucial part of the constitutionally protected right of cross-examination."). Defense counsel did exactly that by bringing out the testimony and then raising it again in closing arguments to portray Rosen as biased toward the complainant.

Therefore, the trial court did not commit reversible error by admitting the evidence, and defendant's argument that counsel was ineffective for failing to challenge the expert's admission or by eliciting the testimony lacks merit.

### 4. FEAR-OF-REPRISAL EVIDENCE

Defendant argues that evidence showing Moccia had a subjective fear of reprisal by defendant was improperly admitted. We conclude that defendant is not entitled to relief on this unpreserved issue.

To recap, defense counsel recalled Moccia for additional cross-examination by defense counsel after Moccia contacted Detective Harrison during the trial and told her that he picked up JP at defendant's address rather than the location he identified in his testimony. On redirect by the prosecutor, Moccia acknowledged that his call to Detective Harrison was recorded and that there was anxiety in his voice during the call. Moccia was asked why he said that he was concerned about his mom's safety, and he answered "[b]ecause we're in a trial on violence against women." Moccia clarified that in the recording he said "my mom, my sister, my nieces, my whole family." When the prosecutor asked, "more specifically, why were you worried about your mom's safety?", defense counsel objected on grounds that Moccia had already answered the question. When questioned about his concerns about returning to testify, Moccia stated he had spelled his name out twice "in front of an alleged violent offender," and expressed concern that the defendant could "Google" him just as Moccia had Googled defendant. The prosecutor pressed that Moccia had already spoken to a detective in June 2022. Defense counsel objected "to this line of questioning. The purpose for bringing Mr. Moccia back was based upon information that he provided after his previous testimony." After a bench conference, the objection was overruled.

During the prosecutor's closing argument, the prosecutor noted that Moccia did not want to come back to testify again and said, "he was afraid for his mom. He was afraid because he was testifying a second time in front of the defendant."

On appeal, defendant argues that the "subjective fear of reprisal" brought out in Moccia's testimony lacked the supporting evidence that would be required for admitting evidence of a threat against a witness. Specifically, defendant argues that there was no evidence that defendant personally threatened or solicited a threat against Moccia or his family, and therefore that the admission of Moccia's testimony regarding his fear of reprisal was improper.

As an initial matter, this issue is unpreserved. Although defense counsel objected to some of the questioning about Moccia's fears, the bases for the objections were asked-and-answered and being outside the scope of what Moccia was brought back to testify regarding. To preserve an issue regarding the admission of evidence, a defendant must object to the evidence at trial and specify the same ground for objection on appeal that they raised in the trial court. MRE 103(a)(1); *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Because in this instance defendant objected on different grounds, this issue is unpreserved. See *id.* We therefore review it for plain error affecting substantial rights. See *Lukity*, 460 Mich at 495-496; *Carines*, 460 Mich at 763-764.

Turning to the merits, as defendant notes, any evidence that a defendant has solicited others to influence witnesses or suppress testimony—by threats, bribes, or otherwise—can be highly prejudicial. Citing *People v Salsbury*, 134 Mich 537, 569-570; 96 NW 936 (1903), defendant argues that "before such evidence can be considered it must be made to appear that the effort was made at the instigation of the defendant, or with his consent or approval, or at least with the knowledge or expectation that it had been or would be made." But *Salsbury* was speaking to evidence of third-party threats to a witness that the prosecution offers as evidence of the defendant's consciousness of guilt. *Id.* at 569; see also *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996) (stating that a "defendant's threat against a witness is generally admissible" because it "can demonstrate consciousness of guilt"). That scenario is not present here. Moccia did not testify that a third party threatened him on defendant's behalf, or even that defendant threatened him. Instead, on redirect after changing his testimony, Moccia testified that he was concerned for the safety of his mother and other women in his family "[b]ecause we're in a trial on violence against women." When questioned about his concerns about returning to testify, Moccia did not express that he had received a threat, but rather expressed concern that defendant could later look up his identifying information.

If Moccia had been threatened by defendant, then such evidence would be admissible to show consciousness of guilt. See *Sholl*, 453 Mich at 740. However, that was not Moccia's testimony, and there was no suggestion that someone else at defendant's behest had threatened Moccia. Therefore, *Salsbury* does not apply. Further, a witness's credibility is "always an appropriate subject for the jury's consideration," and evidence of a witness's "bias or interest in a case is highly relevant to credibility." *People v Coleman*, 210 Mich App 1, 8; 532 NW2d 885 (1995). Moccia had changed his testimony in the middle of trial and had expressed anxiety in his recorded telephone call with Detective Harrison where he reported the new information, so it was not improper for either party to question Moccia about the source of that anxiety to challenge his credibility or bolster it.

Additionally, for defendant to satisfy the plain-error standard on this issue, he must demonstrate not only that the admission of Moccia's testimony was error, but that the error was "plain, i.e., clear or obvious." *Carines*, 460 Mich at 763. Any implication from Moccia's testimony that he had been threatened was far from "clear or obvious." To the contrary, Moccia's testimony concerning his fear of reprisal was admissible to the extent it went to the jury's assessment of his credibility. See *Coleman*, 210 Mich App at 8. Accordingly, defendant is not entitled to relief.

-16-

Defendant argues that his rights to due process, a fair trial, and to present a defense were denied when the trial court refused to allow defense witness Tyreece Curtis to testify by video. Defendant is not entitled to relief on this issue.

The use of videoconferencing technology in court proceedings is governed by MCR 6.006. When determining whether to allow the use of videoconferencing technology, trial courts must consider the factors contained in MCR 2.407 as well as constitutional requirements. MCR 6.006(A)(3). "[T]he use of videoconferencing technology shall not be used in . . . jury trials . . . except in the discretion of the court after all parties have had notice and an opportunity to be heard on the use of videoconferencing technology." MCR 6.006(B)(4). The decision to admit or deny the use of videoconferencing technology at trial under MCR 6.006 is reviewed for an abuse of discretion. *People v Buie*, 491 Mich 294, 319; 817 NW2d 33 (2012).

Outside the presence of the jury after JN's testimony, the prosecutor alleged that defendant told his brother Tyreece Curtis in a jail call what JP testified about, a direct violation of the trial court's sequestration order. There was not enough time for the defense to listen to the jail calls, so the witness could not be called that day even though he had a flight out the next day.[8]

Following HC's testimony about a week later, defense counsel represented that Tyreece Curtis's wife was in a car accident and he could not return to Lansing, and asked if he could appear by Zoom. Tyreece Curtis had previously flown in and was expected to testify in person given the prosecution's representations about when its case-in-chief would end. But when the case-in-chief ran long, the court planned to allow Tyreece Curtis to testify out of turn before his return flight, but the reexamination of Moccia went long and there was no time.

The prosecution objected to Tyreece Curtis's testimony by Zoom because of the "previous documented witness tampering and [the] sequestration order being violated." The prosecution expressed concern about the witness being influenced during his testimony such as by getting texts in real time or if he wrote down things that were said. Defense counsel represented that Tyreece Curtis's testimony would be about the layout of the house where the incident allegedly occurred and what he saw and heard when JP was in the home. In arguing against the defense's request, the prosecution cited MCR 6.006(B)(4) and *People v Meconi*, 277 Mich App 651; 746 NW2d 881 (2008) (discussing accidental versus intentional violations of a sequestration order).

The trial court ruled against allowing the testimony by videoconference. The trial court found merit in the concern about remote proceedings given the contact between defendant and his brother, who had been expected to testify. The trial court remarked that conducting a cross-examination remotely does not have the same impact as testifying in person. The court cited MCR 6.006, which incorporates the requirements of MCR 2.407. The court addressed the factor on capabilities of the court and parties to participate in a video conference and noted that there are

---

[8] Indeed, defendant later admitted during his testimony that he told his brother on the phone while trial was ongoing what JP testified about in court.

ways to do that with safeguards. Another factor is articulable prejudice, and the prosecution spoke to prejudice. Defense counsel addressed the convenience and costs of transport, i.e., the family does not have the money to bring him back. As for whether the procedure would allow for full and effective cross-examination, the trial court found that it cut in favor of not allowing videoconference testimony. The trial court doubted whether the courtroom could be effectively extended to the remote location.

Thus, the trial court considered the factors in MCR 2.407 when rendering its decision on defendant's request to allow Tyreece Curtis to testify using videoconferencing technology. But defendant does not dispute the trial court's evaluation of those factors. Instead, defendant argues that the trial court effectively precluded a defense witness from testifying as a sanction for defendant's misconduct and abused its discretion in doing so, citing *People v Merritt*, 396 Mich 67, 82; 238 NW2d 31 (1976), and *People v Taylor*, 159 Mich App 468, 482; 406 NW2d 859 (1987).

We conclude that defendant's argument lacks merit because the trial court did not preclude Tyreece Curtis from testifying. Instead, the trial court denied a request for videoconferencing. "Although the right to present a defense is a fundamental element of due process, it is not an absolute right. The accused must still comply with established rules of procedure . . . ." *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984) (quotation marks and citation omitted). Because the inability to present Tyreece Curtis's testimony stemmed from the trial court's reasonable application of MCR 6.006 and MCR 2.407, the ruling did not violate defendant's right to due process, a fair trial, or to present a defense.

Even if the trial court abused its discretion in disallowing videoconference testimony, defendant has not demonstrated prejudice. Defense counsel represented that Tyreece Curtis's testimony would be about the layout of the house where the incident allegedly occurred and his observations when JP was present. However, the testimony about the home's layout would have been cumulative, as defendant's grandmother and defendant himself testified regarding this. And testimony that Tyreece Curtis might have offered regarding his observations of JP and defendant would not have been particularly material. Both JP and defendant testified that Tyreece Curtis and his partner retired to their bedroom before the offense occurred in defendant's bedroom. The crux of the dispute at trial was whether sexual penetration between defendant and JP was consensual, and Tyreece Curtis's proposed testimony did not purport to shed light on that question. Accordingly, defendant has not shown outcome-determinative prejudice warranting reversal. See *McLaughlin*, 258 Mich App at 650.

C. PROPORTIONALITY OF SENTENCE

Lastly, defendant challenges the proportionality of his sentence. We disagree that defendant's sentence is disproportionate.

"[D]efendants may challenge the proportionality of any sentence on appeal and [] the sentence is to be reviewed for reasonableness." *People v Posey*, 512 Mich 317, 360; 1 NW3d 101

-18-

(2023) (opinion by BOLDEN, J.).[9] Challenges to the proportionality of a sentence are reviewed for abuse of discretion. *Id.* at 325; *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). "A trial court abuses its discretion if the imposed sentence is not 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Ventour*, 349 Mich App 417, 429; 27 NW3d 660 (2023), quoting *Steanhouse*, 500 Mich at 459-460.

A within-guidelines sentence is presumptively proportionate, but that presumption may be overcome. *Posey*, 512 Mich at 360. To rebut this presumption, a defendant must present "unusual circumstances that would render the presumptively proportionate sentence disproportionate." *Ventour*, 349 Mich App at 430 (quotation marks and citation omitted). Unusual circumstances are uncommon or rare. *Id.*

The trial court sentenced defendant to 17.5 to 80 years (210 to 960 months). Defendant's sentence fell within, but at the top of, the guidelines range of 10.5 to 17.5 years (126 to 210 months).

Defendant argues that his sentence is not proportionate, explaining that the guidelines already incorporate defendant's criminal history, that these are not the worst facts, and that defendant is not the worst offender. Defendant also stresses that he attended sex offender classes before this offense was prosecuted (which was required by the terms of his probation) and worked through being sexually assaulted as a child while starting a family of his own. But these factors do not appear to be particularly unusual such that defendant's within-guidelines sentence was disproportionate. See *Ventour*, 349 Mich App at 430.

Review of the record reveals that the trial court carefully composed defendant's sentence, stressing defendant's history, likelihood of rehabilitation, and impact on the victim. In imposing defendant's sentence, the trial court observed that defendant's criminal history was "extremely disturbing." The trial court witnessed firsthand the testimony in the case concerning other acts of sexually predatory behavior perpetrated by defendant in multiple locations against multiple women and girls. In 2018 at the Meridian Mall, defendant told CM that he had just seen her go to the bathroom and that he liked the color of her underwear. In 2019, defendant masturbated in front of JN outside the courthouse in downtown Lansing. Also in 2019, defendant followed a 17-year-old girl around the East Lansing Public Library while video captured him publicly masturbating across from her, and he remarked on her "camel toe" and asked to see the nail polish on her feet. Also in 2019, video surveillance captured defendant filming women, masturbating in public, and following a woman into the women's restroom at Schuler Books. That same year, defendant followed a college student walking alone at night in East Lansing and masturbated in front of her, for which

---

[9] Justice BOLDEN's plurality opinion, joined by Justice BERNSTEIN, is not binding on its own, but in concurring opinions, Justices CAVANAGH and WELCH agreed that within-guidelines sentences are reviewed for reasonableness and carry a rebuttable presumption of proportionality. See *Posey*, 512 Mich at 361, 390 (CAVANAGH, J., concurring); *id.* at 390, 411-414 (WELCH, J., concurring). Our Court, therefore, treats the principles announced in Justice BOLDEN's lead opinion as controlling. See *People v Posey (On Remand)*, 349 Mich App 199, 203; 27 NW3d 137 (2023); *People v Purdle*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 3-4.

he was criminally prosecuted and pleaded guilty. Finally, EH testified that he sexually assaulted her in 2020 in Georgia. Defendant also has convictions for carrying a concealed weapon and first-degree home invasion, for which he served prison time and violated probation by failing to report, and he violated parole numerous times by assaulting his girlfriend, assaulting his parole agent, absconding, picking up an indecent exposure and retail fraud conviction, and committing curfew tether violations.

The trial court properly stressed reformation of the offender, one of the traditional objectives of sentencing in Michigan, as a rationale for the sentence imposed. See *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972); *People v Bennett*, 335 Mich App 409, 418; 966 NW2d 768 (2021). The trial court observed that defendant's history did not bode well for future rehabilitation, given that defendant already had multiple chances to rehabilitate.

Regarding the seriousness of the crime, defendant committed a violent sexual assault against a teenage victim, physically and mentally harming her and exposing her to the possibility of unwanted pregnancy. JP has been unable to forget the traumatic incident, which occurred nearly 11 years before her testimony. The trial court stated that it did not believe anything lower than the top end of the guidelines would be reasonable and proportionate, in consideration of the maximum sentence as well.

Defendant's argument that his guidelines range of 84 months is excessively wide is more appropriately directed to the Legislature or the newly reestablished Michigan sentencing commission. See MCL 769.34a.

In conclusion, defendant has not rebutted the presumption that his within-guidelines sentence was proportionate to the offense and the offender. See *Ventour*, 349 Mich App at 429.

## III. CONCLUSION

Defendant's arguments lack merit. The other-acts evidence was admissible under MCL 768.27b and/or MRE 404(b) and was not substantially outweighed by the danger of unfair prejudice under MRE 403. Hearsay statements by expert Yates were admissible under MRE 803(4). Rosen's expert testimony did not violate defendant's right to due process because defendant elicited the testimony, and defense counsel was not ineffective for failing to object. Admitting evidence concerning Moccia's fear of reprisal was not plain error. The trial court did not abuse its discretion in disallowing the videoconference testimony, and to the extent the trial court erred, defendant has not shown outcome-determinative prejudice. And finally, defendant has not rebutted the presumption that his within-guidelines sentence was proportionate.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Christopher P. Yates
/s/ Kathleen A. Feeney